**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
KENG VANG,                      )
                                )
          Plaintiff,            )
                                )
     v.                         )        1:18cv565
                                )
LAUREN ASHBY, et al.,           )
                                )
          Defendants.           )
```

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on Defendant Shannon McClattie ("Defendant McClattie")'s Motion for Summary Judgment (Docket Entry 42) and Plaintiff's Motion for Summary Judgment (Docket Entry 49). For the reasons that follow, the Court should grant Defendant McClattie's summary judgment motion and should deny Plaintiff's summary judgment motion.

BACKGROUND

**I. Procedural History**

Keng Vang (the "Plaintiff"), commenced this action in forma pauperis pursuant to 42 U.S.C. § 1983 in connection with Defendants' removal of his children from his home subsequent to a child abuse investigation, in violation of the "4th, 5th, and 14th [A]mendments" and "NC DHHS policy." (Docket Entry 2 at 4.)[1]

---

[1] Citations to Docket Entry pages utilize the CM/ECF footer's pagination. In addition, in quoting Plaintiff's filings, this Recommendation applies standard capitalization conventions for ease
(continued...)

Plaintiff pursued his claims against Defendants in both their individual and official capacities. (See id. at 2-3.) At the screening stage, the undersigned recommended dismissal of all claims against Lauren Ashby ("Ms. Ashby") and Detective Ryan Barkley (Docket Entry 3 at 5), and further found that the Complaint's "allegation that [Defendant] McClattie entered [Plaintiff's] home without permission or a warrant [wa]s sufficient to state a claim against her for violating [Plaintiff's] rights . . . [and] allow[ed] Plaintiff's case against [her] to proceed . . . as to that claim only" (id. at 3). The Honorable William L. Osteen, Jr., United States District Court Judge, adopted that recommendation. (Docket Entry 7.) As a result, the surviving claim in the Complaint concerns Defendant McClattie, whom the Complaint identifies as a "Supervisor" for the Rowan County Department of Social Services (the "DSS"). (Docket Entry 2 at 3.)

In response, Defendant McClattie answered, denying any improper actions and asserting immunity defenses. (Docket Entry 12.) Following a six-month period for discovery (see, e.g., Text Order dated May 30, 2019), Defendant McClattie filed her summary judgment motion (see Docket Entry 42; see also Docket Entry 43 (summary judgment brief); Docket Entry 43-1 (Affidavit of Defendant McClattie); Docket Entry 43-2 (Affidavit of Ms. Ashby); Docket

---

[1](...continued)
of reading.

Entry 43-3 (Affidavit of Cynthia Dry); Docket Entry 43-4 (Affidavit of Detective Cody Trexler); Docket Entry 43-5 (Deposition of Plaintiff)).[2]  Plaintiff responded (Docket Entry 51) and Defendant McClattie replied (Docket Entry 53).  In addition, Plaintiff filed his summary judgment motion (Docket Entry 49) and Defendant McClattie responded (Docket Entry 50).

## II. Factual History

As relevant to the summary judgment motions, the record reflects the following:

## A.  Plaintiff's Allegations

According to Plaintiff's Complaint, "the events giving rise to [his] claim arose . . . [a]t [his] home . . . .  [The v]iolation happened on . . . 03/09/2018."  (Docket Entry 2 at 4.)  More specifically as to Defendant McClattie, the Complaint alleges that the following occurred on March 9, 2018:

> [Defendant] McClattie in armo[red] vest led Rowan Police Department, five officers to be exact, also in body armo[]r with guns and tasers[, ] to the residen[ce] of [Plaintiff] without a warrant or court order and that evening[, ] apprehended [Plaintiff's children]. [Defendant] McClattie and [an o]fficer forced their way in without approval from [a j]udge or [m]agistrate under

_____

[2] Defendant McClattie filed her summary judgment brief and related attachments in redacted form.  (See Docket Entries 43, 43-1, 43-2, 43-3, 43-4, 43-5.)  She also filed a motion to seal along with sealed unredacted versions of the summary judgment brief and related attachments.  (See Docket Entries 44, 47, 48, 48-1, 48-2, 48-3, 48-4, 48-5.)  Formal resolution of that motion will occur via separate order at a later date, but resolution of the parties' competing summary judgment motions necessitated public disclosure of some of the redacted material.

3

oath to take actions that occurred that afternoon [which v]iolated the 14th amendment [right] of [Plaintiff, Plaintiff's wife], and all four children. Deprived of their life, liberty, and freedom instantly without proper due process of law and procedur[e].

. . . .

[Defendant] McClattie was rude and f[or]ceful. She had a strong attitude that was admirable, but [Plaintiff] only ask[s] for one thing and that was a warrant from Rowan County Sheriff's and [DSS]. Their invest[i]gation of the child abuse case [wa]s flawed and not thoroughly conducted. They used scare tactic[s] and folly [sic] actions on a natural born United State[s] citizen . . . .

(Id. at 18-21.)[3]

## B. Defendant McClattie's Affidavit

In regard to these allegations, Defendant McClattie submitted an affidavit (the "McClattie Affidavit") (Docket Entry 48-1), which reflects the following:

. . . . It is my understanding that [Plaintiff] contends that I entered his home on March 9, 2018[,] unlawfully, without his permission or a warrant. His contentions are false, as I had his express permission to enter his home on March 9, 2018. . . .

I currently serve as the Children's Services Supervisor for the Rowan County [DSS], a position that I have held since October 2012. . . .

As [a] supervisor, I engaged in Two-Level Review with [Ms.] Ashby, the Social Worker assigned to the [CPS] investigation into allegations of physical abuse by [Plaintiff] of his child. . . .

. . . .

---

[3] As previously observed, Plaintiff, "acting as a pro se party, cannot raise claims on behalf of others . . . ." (Docket Entry 3 at 2-3.)

4

> I chose to accompany [Ms.] Ashby to assist her in taking temporary custody of [Plaintiff's] children. . . .
> . . . . Consequently, we coordinated with the Rowan County Sheriff's Office for several Sheriff's Deputies to escort us to [Plaintiff's] house to help maintain peace and order. . . .
>
> . . . .
>
> Upon our arrival  at [Plaintiff's] residence, we all parked our respective cars and slowly got out of them. Per our plan, I took the lead in interacting with [Plaintiff] while Ms. Ashby and the Deputies stayed in the background by design.  As I walked up the driveway of the house toward a door located under a carport, [Plaintiff] open[ed] the door.  He stood in the doorway and asked me who I was and why I was there.  I identified myself to [Plaintiff] and told him that Ms. Ashby and I had come to take temporary custody of his children. . . . .  [Plaintiff] stated that we did not have authority to take custody of his children. . . . [Plaintiff] was loud and aggressive.  However, I maintained a calm, 'matter of fact' demeanor which seemed to de-escalate his anger.  I asked him to please come outside of his house and speak with me, and he did so. We continued talking face to face under the carport. . . . .
>
> After a few minutes, [Plaintiff] asked me if we could discuss the matter further in private inside his house. He invited me to come inside of his house, but told me that [neither Ms. Ashby] nor any police officers were allowed inside. . . . [Plaintiff] turned around and went inside his house, and I followed him.  Ms. Ashby and the Sheriff's Deputies remained outside. . . .

(<u>Id.</u>, ¶¶ 1-12 (numbers omitted).)

### C. Other Supporting Affidavits

Along with her summary judgment motion, Defendant McClattie also submitted affidavits from Ms. Ashby (the "Ashby Affidavit") (Docket Entry 48-2) and Detective Cody Trexler (the "Trexler Affidavit") (Docket Entry 48-4), a "duly appointed and sworn Rowan

5

County Deputy Sheriff, holding the rank of Detective Sergeant" (id., ¶ 2), "detailed to accompany . . . [Ms.] Ashby and [Defendant] McClattie" (id., ¶ 3).  The Ashby Affidavit states that the following occurred at Plaintiff's house on the afternoon of March 9, 2018:

> . . . . [Defendant] McClattie took the lead, walking toward the main door of the house, which opened out onto a carport on the side of the house.  Before [Defendant] McClattie got to the door, [Plaintiff] opened the door and stood in the open doorway. [Defendant] McClattie stopped walking and stood still, while the Sheriff's Deputies and [Ms. Ashby] stood silent several yards behind her.
>
> [Defendant] McClattie began to talk with [Plaintiff] advising him that she and [Defendant Ashby] had come to take temporary custody of [Plaintiff's] children. . . . [Plaintiff] did not like what [Defendant McClattie] was saying to him, and angrily responded that we could not take custody of his children. [Defendant] McClattie remained calm, but firm. . . .
>
> [Plaintiff] eventually came outside to talk with [Defendant] McClattie [and a]fter a short while, [he] invited [Defendant] McClattie inside his home. . . .  He told [Defendant] McClattie that she could come inside [of] his house, but that the rest of us had to stay outside.    At [Plaintiff's] invitation, [Defendant] McClattie followed [Plaintiff] inside of his home, while the Sheriff's Deputies and I remained outside.

(Docket Entry 48-2, ¶¶ 24-26 (numbers omitted).)

The Trexler Affidavit provided this similar account:

> After we all exited our vehicles, [Defendant] McClattie walked up the driveway toward the main door of the house, which was located under a carport.  The other Deputies and I remained well behind [Defendant] McClattie in the driveway . . . .
>
> As [Defendant] McClattie approached the door of the house, I saw an Asian male, whom I understand was

6

[Plaintiff], come to the door.  He spoke with [Defendant] McClattie for a few minutes.  [Plaintiff] opened the door and eventually came outside, where he continued talking with [Defendant] McClattie.  I could not hear any specific details of the conversation between [Plaintiff] and [Defendant] McClattie, as I was standing approximately thirty (30) feet behind [Defendant] McClattie in the driveway.  However, I did not hear either of them raise their voice to one another, nor did I perceive the interaction between [Plaintiff] and [Defendant] McClattie as being overly hostile or confrontational under the circumstances.  Eventually, [Plaintiff] turned around and went back inside of his house, with [Defendant] McClattie following closely behind him.  I did not perceive or hear anything suggesting to me that [Defendant] McClattie did not have permission from [Plaintiff] to go inside of his house.

I, along with Ms. Ashby and the other four deputies, remained outside of the house. . . .

(Docket Entry 48-4, ¶¶ 6-8 (numbers omitted).)

### D. Plaintiff's Deposition

In further support of her summary judgment motion, Defendant McClattie submitted a transcript of Plaintiff's deposition.  (See Docket Entry 48-5.)  In his deposition, Plaintiff stated that, upon the arrival of DSS employees and law enforcement officers on the afternoon of March 9, 2018, Plaintiff "went straight to . . . the door and . . . went at it [with Defendant McClattie]." (Id. at 61.)  Plaintiff explained that (i) he "was at the threshold," (ii) Defendant McClattie "was on the opposite side" and (iii) Defendant McClattie "was very aggressive and wanted to take the kids."  (Id. at 62.)  Plaintiff then averred that he told [Defendant] McClattie "to go get a warrant."  (Id.; see also id.

7

(testifying that Defendant McClattie insisted that "social workers" do not "need a warrant" to take temporary custody of children).)

At that point in the deposition, Plaintiff reported that Defendant McClattie "forced her way in . . . the house" (id.), and that he "gave in to the coercion, the bod[y] armor, the . . . powerhouse[,] . . . . the detective, . . . the tactic" (id. at 63). However, a short time later in the deposition, Plaintiff admitted that he "didn't want [Defendant McClattie] to take the kids[,] so [he] told her [that he wanted to] talk to [her] in private . . . . [He then] told [Defendant McClattie] to come in the house . . . but [he didn't] want the[] officers in the house. [He] told them to stay outside." (Id. at 67.) Plaintiff further confirmed that, during his discussion with Defendant McClattie inside the house, Ms. Ashby and the law enforcement officers remained outside, except for a brief moment when a law enforcement officer "started coming inside the house." (Id. at 67-68.) Moreover, when Plaintiff "said get out of the house" (id. at 68), that officer "stepped out" (id.).

## DISCUSSION

### I. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the

8

evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)).

If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. Additionally, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>,

4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## II. Defendant McClattie's Summary Judgment Motion

### A. Individual Capacity Claim

In her brief supporting her summary judgment motion, Defendant McClattie has argued that "the undisputed evidence in this matter clearly demonstrates that there was no violation of Plaintiff's constitutional rights, as Plaintiff admits that he expressly consented to [her] entry into his home." (Docket Entry 43 at 14.)[4] Plaintiff's response does not dispute that he consented to

---

[4] Defendant McClattie's sealed brief also contends that, "pursuant to [a] North Carolina [statute], [she] was authorized to enter Plaintiff's home without a court order to take temporary custody of Plaintiff's children." (Docket Entry 48 at 18 (all caps and bold font omitted).) However, Plaintiff's voluntary consent allowing Defendant McClattie's entry into his home renders discussion of this North Carolina statute unnecessary.

Defendant McClattie's entrance into his home. (See Docket Entry 51 at 1–22.) Instead, it asserts the following:

> Defendant McClattie used intimidating behavior and coercive scare tactic[s] that put Plaintiff in immediate fear of the consequences that compelled [] Plaintiff to act against his will. Under duress[, P]laintiff requested [] Defendant McClattie [] come in his house and begged her not to take his children, that DSS had no authorization, and that there was no child abused in the household. It was a necessity to beseech with [] Defendant [McClattie] inside the house, leaving the heavily armor[ed l]aw enforcement officers in the carport . . . ."

(Id. at 13.)

"The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Pratt v. Allbritton, No. 4:16CV198, 2018 WL 4610151, at *9 (E.D.N.C. Aug. 8, 2018) (unpublished) (internal brackets omitted) (quoting U.S. Const. amend. IV), aff'd, 764 F. App'x 343 (4th Cir. 2019)). However, "[w]hen considering Fourth Amendment challenges to investigations by DSS officials, the Fourth Circuit has explained that 'investigative home visits by social workers are not subject to the same scrutiny as searches in the criminal context.'" Id. (internal bracket omitted) (quoting Wildauer v. Frederick Cty., 993 F.2d 369, 372 (4th Cir. 1993)); see also Parker v. Henry & William Evans Home for Children, Inc., 762 F. App'x 147, 154 (4th Cir. 2019) (noting that the Fourth Circuit has "not articulated the legal standard

11

that applies to Fourth Amendment unlawful seizure claims in the child removal context").

In any event, even under the criminal standard, Plaintiff's claim ultimately fails. Of particular note, "'[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained [] from the individual whose property is searched . . . .'" United States v. Azua-Rinconada, 914 F.3d 319, 324 (4th Cir. 2019) (quoting Illinois v. Rodriquez, 497 U.S. 177, 181 (1990)). "The question whether consent to search is voluntary — as distinct from being the product of duress or coercion, express or implied — is one 'of fact to be determined from the totality of all the circumstances.'" Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).

Contrary to Plaintiff's (unsworn) assertions, Defendant's supporting affidavits and Plaintiff's own sworn testimony refute any allegation of involuntary consent. In that regard, the McClattie Affidavit, the Ashby Affidavit, and the Trexler Affidavit show that, shortly after their arrival to Plaintiff's residence, (i) Defendant McClattie and Plaintiff engaged in conversation, (ii) Plaintiff ultimately invited Defendant McClattie inside of his residence and coupled that invitation with a directive that Ms. Ashby and law enforcement officers remain outside, (iii) Ms. Ashby

12

and law enforcement officers complied with that instruction and, at a later point, (iv) when one or more law enforcement officers briefly entered the residence, the officer(s) immediately exited upon Plaintiff's request. (See Docket Entry 48-1, ¶¶ 11-13; accord Docket Entry 48-2, ¶¶ 25-27; Docket Entry 48-4, ¶¶ 7-9.)

Similarly, in his sworn testimony, Plaintiff stated that, after conversing with Defendant McClattie from his doorway (see Docket Entry 48-5 at 61-67), he "didn't want her to take [his] kids[,] so [he] told her well, let me talk to you in private" (id. at 67). Plaintiff then confirmed that he "told [Defendant] McClattie to come in the house . . . but [that he didn't] want the[] officers in [his] house. [He] told them to stay outside." (Id.) According to Plaintiff, at a later point in his conversation with Defendant McClattie, "one of the officers started coming inside [of his] house." (Id. at 68.) Plaintiff "told all of them[, including Defendant McClattie, to] step out of the house . . . [a]nd they stepped out . . . ." (Id.)

This record conclusively establishes that Plaintiff not only voluntarily consented to Defendant McClattie's entry, but actually invited her into his home because he believed doing so served his interest, by giving him a better chance to talk her out of taking temporary custody of his children. Plaintiff's Fourth Amendment claim therefore fails as a matter of law.

13

Alternatively, Defendant McClattie has requested summary judgment based on qualified immunity. (Docket Entry 43 at 14.) "Qualified immunity from [Section] 1983 claims 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Doe ex rel. Johnson v. South Carolina Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Put simply, qualified immunity "ensures that officials are not unfairly strung up for money damages as a result of bad guesses in gray areas [and] [i]t encourages capable citizens to join the ranks of public servants by removing the threat of constant litigation." Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011) (internal citation and quotation marks omitted). "Determining whether qualified immunity applies involves a two-prong inquiry: 'whether the facts make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014) (quoting Pearson, 555 U.S. at 232 (internal ellipsis omitted)).

For reasons discussed above, Defendant McClattie has identified an absence of evidence to support Plaintiff's claim of unlawful deprivation of his constitutional rights and thus the qualified immunity doctrine also defeats his claim.

14

B. Official Capacity Claim

Lastly, Plaintiff's official capacity claim against Defendant McClattie constitutes a claim "against the governmental entity employing [her]," Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006), i.e., the Rowan County DSS. Assuming for purposes of discussion only that the foregoing entity qualifies as a person subject to suit under § 1983, "it must be shown that the actions of [their employee] were unconstitutional and were taken pursuant to a custom or policy of the entity." Giancola v. State of W. Va. Dep't of Pub. Safety, 830 F.2d 547, 550 (4th Cir. 1987) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-92, (1978)). As detailed previously, the record does not support Plaintiff's allegations of unconstitutional actions taken by Defendant McClattie. Further, the Complaint fails to allege facts which (if accepted as true) would establish that any constitutional violations occurred pursuant to a custom or policy of the Rowan County DSS. (See Docket Entry 2 at 1-22.) Therefore, any official capacity claim obviously fails as a matter of law.

### III. Plaintiff's Summary Judgment Motion

Plaintiff also moved for summary judgment. (See generally Docket Entry 49.) For reasons discussed above, Defendant McClattie has demonstrated entitlement to summary judgment. Further, as Defendant McClattie correctly has contended, "Plaintiff d[id] not offer any competent evidence in support of his motion for summary

15

judgment. . . . [and he] completely ignore[d] his own sworn deposition testimony . . . that is fatal to his case." (Docket Entry 50 at 3.) Simply put, Plaintiff's motion does not alter the record facts that establish Defendant McClattie's entitlement to summary judgment and that preclude entry of judgment in his favor.

<u>CONCLUSION</u>

The record compels the entry of judgment as a matter of law for Defendant McClattie on Plaintiff's individual and official capacity claims.

**IT IS RECOMMENDED** that Defendant McClattie's summary judgment motion (Docket Entry 42) be granted and that Plaintiff's summary judgment motion (Docket Entry 49) be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 17, 2020